UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:04CV-78-R

WILLIAM A. BANISTER                                                                          PLAINTIFF

v.

COMMONWEALTH OF KENTUCKY, et al.                                              DEFENDANTS

## MEMORANDUM OPINION

Defendants have moved for summary judgment (Dkt. # 10).  Plaintiff responded (Dkt. # 12), Defendants replied (Dkt. # 13), and this matter is now ripe for decision.  For the reasons given below, Defendants' motion for summary judgment is **GRANTED**.

## BACKGROUND

Plaintiff William Banister, a 59-year-old Caucasian man, was employed by the University of Kentucky ("University") in various positions at its Agricultural Research and Education Center (AREC) in Princeton, Kentucky for approximately 30 years.  For the final twelve years of his employment, he held the position of "Carpenter II," which meant that he was essentially the head carpenter at the center, supervising and working with several other employees to maintain the AREC.  As part of his employment, Mr. Banister and his wife lived in a residence on the University property.  In 2003, one of the employees who worked with Mr. Banister, Billy Riley (then the only African-American employee at the AREC), complained to his supervisor, Donnie Davis, about racial harassment he believed he had received from Mr. Banister.  Riley also filed a complaint with the Equal Employment Opportunity Commission (EEOC) which alleged racial discrimination by several AREC employees, including Mr.

1

Banister. Once the University's Human Resources department received notice of the EEOC complaint, it took steps to investigate Mr. Riley's charges as it was required to do in order to present the University's position to the EEOC. This investigation was conducted primarily by Terry Allen, then the University's Assistant Vice-President for Affirmative Action, and James Lawson, who is an Assistant to the University's Dean of Agriculture and who handles many personnel issues within the department. The two traveled from Lexington to Princeton on April 17, 2003 and conducted interviews with Mr. Riley, Mr. Banister, Mr. Davis, and June Johnston, another AREC employee alleged in Mr. Riley's EEOC complaint to have made racially harrassing comments to him. In the course of his interview, Mr. Riley described several other incidents of racial harassment and also gave Mr. Allen and Mr. Lawson a written statement discussing various past incidents not mentioned in his EEOC complaint.

    During Mr. Banister's interview with Mr. Allen and Mr. Lawson, they asked him directly about the comments Mr. Riley alleged he had made. Mr. Riley alleged that a rumor had been circulating that he and Mr. Banister's daughter, Beth, were dating, and that when Mr. Riley confronted Mr. Banister and told him that the rumor was not true, Mr. Banister said essentially that he was glad the rumors were not true, because if they had been, something "serious" would have happened to Mr. Riley and Ms. Banister. Ms. Banister had allegedly also told Mr. Riley that she believed that if she dated a black man, her father would probably kill her. Mr. Riley alleges that Mr. Banister had expressed to him in other contexts as well that he strongly disapproved of inter-racial dating and marriage and that he made derogatory comments about the physical attributes of some black women, which Mr. Banister denied. Mr. Allen and Mr. Lawson also discussed with Mr. Banister an incident Mr. Riley reported to them involving a

2

poster of the University's basketball team that had been hanging at the AREC. Mr. Riley alleged that the eyes of the African-American players on the poster had been poked out, but that he did not know by whom; Mr. Banister told Mr. Allen and Mr. Lawson that he had not been involved in the defacing of the poster. Subsequently, Mr. Allen and Mr. Lawson conducted interviews with several other AREC employees as a result of the further allegations made by Mr. Riley in his interview and written statement. The University then took disciplinary action in response to the interviews. Due to the "severity," "persistence," and "offensiveness" of the remarks that Mr. Banister admitted to having made, the University decided, upon recommendation of Mr. Allen, to either involuntarily terminate his employment or to permit him to retire without eligibility for re-hiring. (Deposition of Terry Allen, Attachment #10 to Dkt. # 11, Certificate of Necessity, p. 31, 34.)

Mr. Banister, when presented with this choice, decided to retire rather than be terminated. The University then allowed him to file a grievance; pursuant to the University's Human Resources Policy and Procedure, a Stage IV Hearing was held; the panel from that hearing filed a report and recommendation with the University Provost, Defendant Nietzel, who adopted the panel's findings and denied Banister's request for reinstatement. Mr. Banister then filed suit in Caldwell Circuit Court, and the University removed the case to this court. Mr. Banister seeks (1) "[a] decree and judgment setting aside the final order of the University of Kentucky dated 26 February 2004" and "declaring that [Mr. Banister] was terminated in violation of the University of Kentucky Human Resources Policy and [Mr. Banister's] federal and state constitutional rights ... [and] the Kentucky Civil Rights Act;" (2) "[a] decree and judgment reinstating [Mr. Banister] to his position..." (3) "such compensation as he would have received had he not been wrongfully

terminated," (4) compensatory damages, (5) costs and expenses, and (6) "[a]n injunction prohibiting [Defendants] from violating the constitutional rights of persons similarly situated in the future." (Complaint, Attachment # 2 ("Exhibit A") to Dkt. #1, Notice of Removal, p. 9-10). Specifically, the federal and state constitutional rights in question are: Mr. Banister's right to due process, freedom of speech and equal protection of the law under both the United States and Kentucky constitutions; Mr. Banister's right to be free from reverse race discrimination as provided in KRS 344.040; and Mr. Banister's right to be free from age discrimination under the Kentucky constitution. Defendants move for summary judgment on the grounds that: (1) Mr. Banister's requests for judicial review of the University's decision are moot; (2) Mr. Banister's due process claims fail because the grievance hearing provided all the process to which he was entitled; (3) Mr. Banister fails to allege facts sufficient to present a claim for reverse race discrimination under the test set forth in *McDonnell-Douglas Corp. v. Green*; (4) Mr. Banister fails to allege facts sufficient to present a claim for age discrimination; (5) Mr. Banister has not stated a viable First Amendment claim; (6) Mr. Banister has not stated a viable equal protection claim; (7) Mr. Banister's wrongful discharge claim fails, or alternatively is barred by the Commonwealth of Kentucky's sovereign immunity.

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable

4

inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of the evidence. To support his position, he must present evidence on which the trier of fact could find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.,* 90 F. 3d 1173, 1177 (6th Cir. 1996). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, Ky., 807 S.W.2d 476 (1991)." *Gafford v. General Electric Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## ANALYSIS

### *Mootness of request for judicial review*

Defendant's summary judgment motion asserts, as an initial matter, that Mr. Banister's requests for judicial review of the University's decision to impose discipline is moot because Mr. Banister "voluntarily" chose to retire rather than face termination. Mr. Banister, on the other

hand, argues that the situation presented is really one of "forced retirement" and that the decision to present Mr. Banister with that "option" is reviewable. The Sixth Circuit Court of Appeals has held that forced retirement gives rise to due process rights. *Jefferson v. Jefferson County Public School System*, 360 F.3d 583, 584 ("...before plaintiff was suspended and allegedly forced to retire she received an appropriate predeprivation, right-of-reply hearing that complies with the due process requirements for such hearings." (citation omitted)).

### *Sufficiency of process afforded Mr. Banister by the University*

Mr. Banister argues that the process, both pre- and post-deprivation, provided to him by the University through its investigation and grievance processes was insufficient to meet the requirements of due process.  The Constitution prohibits government from depriving a citizen of a property interest without due process of law.  The parties agree that Mr. Banister had a property interest in his continued employment with the University and that, as an agency of the government, its termination of his employment constitutes a deprivation of a property interest for due process purposes.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 1487 (1985).  The issue, then, is whether the University comported with the requirements of due process in its dealing with Mr. Banister.

#### *Pre-deprivation process*

First, Mr. Banister argues that the investigation conducted by Mr. Lawson and Mr. Allen prior to his forced retirement did not meet the standards of due process.  It is important first to note the distinction between this case and some other cases in this area, which involve the deprivation of a property interest in benefits such as Social Security and welfare; in those cases, courts have held that the interest being protected is in "uninterrupted" receipt of those benefits.

*See, e.g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Mathews v. Eldridge*, 424 US 319, 331-332, 96 S.Ct. 893, 901 (1976). Here, no facts indicate that Mr. Banister had a similar interest in "uninterrupted" employment; that is to say, in due process terms, that a post-deprivation remedy could have adequately restored Mr. Banister's property interest had the University found that its initial investigation led to the wrong conclusion. Therefore, the standard for Mr. Banister's pre-deprivation process is significantly lower than it would be otherwise. *Id.*

The issue of what procedural protections are required by the due process clause is closely related to the specifics of the deprivation in question. *Id.* at 902. In *Mathews,* the Supreme Court held that

> identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 903. The Court in *Loudermill*, which was also a discharge case, said that "[a]n essential principle of due process is that a deprivation ... be preceded by notice and opportunity for hearing appropriate to the nature of the case. ... This principle requires 'some kind of hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." 470 U.S. 542. The *Loudermill* court went on to note that "[t]he essential requirements [of such a hearing] are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Id.* at 546. It also noted that such a hearing "should be

7

an initial check against mistaken decisions – essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545-546 (citing *Bell v. Burson*, 402 U.S. 535, 540, 91 S.Ct. 1586, 1650, 28 L.Ed.2d 113 (1971)).

Mr. Banister argues that the interview conducted by Mr. Lawson and Mr. Allen prior to the decision to terminate him does not constitute such a hearing. He argues that because (1) he did not receive written notice or advance notice of the interview and (2) he was not afforded the opportunity to respond in writing after the interview but before the termination decision was made, he received insufficient due process prior to his termination. The court finds that in the context of such an investigation, this procedure was not constitutionally deficient; Mr. Banister had the "oral notice" and the opportunity to "present reasons ... in person" contemplated in *Loudermill*, and the hearing did serve as a check on mistaken decisions. That Mr. Banister admitted much of the conduct about which Mr. Lawson and Mr. Allen asked him indicates that they needed to go no further prior to his termination.

*Post-deprivation process*

Mr. Banister also argues that the process he received after his termination was constitutionally insufficient. The post-deprivation process - the grievance procedure - was a hearing at which Mr. Banister was represented by counsel, was permitted to present testimony and evidence in support of his case, and at which evidence was heard which formed the basis for a written report, submitted to the University provost. Mr. Banister argues that he was entitled to a "trial-type proceeding," and he relies on the Kentucky Supreme Court's decision in *Morris v. City of Catlettsburg*, in which the court summarized the requirements of procedural due process

as "including a hearing, the taking and weighing of evidence, the making of an order supported by substantial evidence, and, where the party's constitutional rights are involved, a judicial review of the administrative action." 437 S.W.2d 753, 755 (Ky. 1969) (internal quotation marks and citation omitted). Although the evidence is conflicting on a few details of the procedure followed in the hearing (i.e., whether Mr. Banister's attorney was permitted directly to examine witnesses or whether his questions had to be submitted to the hearing officer first), the basic requirements of the language from *Morris* were met - Mr. Banister had a hearing, at which there was testimony from witnesses, including witnesses for Mr. Banister, the evidence was substantial and was weighed by the panel, and the panel produced a recommendation based upon that evidence.

   The Court returns to the standard elucidated by the United States Supreme Court in *Mathews*, supra: the court must weigh the private interest (Mr. Banister's interest in his continued employment) against the "the risk of an erroneous deprivation of such interest through the procedures used;" "the probable value, if any, of additional or substitute procedural safeguards"; and "finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Although Mr. Banister's interest in his continued employment is, of course, significant and the government's interest in the additional requirements discussed here is relatively low, the risk of erroneous deprivation of such an interest through these procedures is also quite low, and the value of additional procedures would also be so low as to be almost *de minimis*. Therefore, summary judgment is appropriate on Mr. Banister's due process claims.

***Reverse race discrimination***

Defendants also argue that Mr. Banister has not alleged facts sufficient to support a claim of reverse race discrimination by the University in its decision to terminate his employment. The test for such a claim is an adaptation of the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, L.Ed.2d 668 (1973), adopted by the Sixth Circuit Court of Appeals in *Sutherland v. Michigan Dept. of Treasury*. 344 F.3d 603 (6th Cir. 2003). In reverse race discrimination cases, the plaintiff must show: (1) that he is a member of a protected class; (2) that he was qualified for the position; (3) that he suffered adverse employment action; and (4) that he was treated differently than other similarly situated employees outside the protected class. *Id.* at 614. In *Sutherland*, the court noted an additional requirement for plaintiffs bringing *reverse* race discrimination claims: "the plaintiff must demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Id.* (internal quotation and citations omitted). Also, the court noted, to satisfy the fourth prong of the *prima facie* case, "the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." *Id.*

Mr. Banister does not allege facts sufficient to make the *prima facie* case. The major flaw in this case is that Banister cannot point to employees who were treated differently and similarly situated to Mr. Banister but were *not* Caucasian. Several other employees at the AREC were disciplined in the course of the investigation, and each received lesser punishments than did Mr. Banister; however, all the employees who were so disciplined were *also* Caucasian. No complaints of racial harassment were made against non-Caucasians; thus, none were investigated and none were disciplined. Therefore, even if Mr. Banister had (1) alleged the "background

10

circumstances" required by *Sutherland* to suggest that the University was the exceptional institution that discriminated against the majority and (2) successfully demonstrated that he was qualified for the position despite his admitted conduct that violated the University's policies with respect to equal treatment of co-workers, he simply does not allege facts sufficient to meet the fourth prong of the test. Therefore, his reverse race discrimination claim fails.

*Age Discrimination*

Mr. Banister has also alleged that in terminating him, the University engaged in age discrimination. The elements of an age discrimination claim, also derived from *McDonnell Douglas*, are as follows: (1) plaintiff is a member of a protected class (age 40-70); (2) plaintiff suffered adverse employment action; (3) plaintiff was qualified for the position; and (4) plaintiff was replaced by a younger person. *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 940 (6th Cir. 1987). The *Simpson* court also noted that, in the Sixth Circuit, "[a] plaintiff may also show through circumstantial, statistical, or direct evidence that he has been discriminated against." *Id.* (citing *Blackwell v. Sun Electric Corp.*, 696 F.2d 1176, 1180 (6th Cir. 1983)). In *Harker v. Federal Land Bank of Louisville*, the Supreme Court of Kentucky noted that "[t]he Kentucky age discrimination statute is specially modeled after the Federal law. Consequently, in this particular area we must consider the way the Federal act has been interpreted." 679 S.W.2d 226 (Ky. 1984).

Regardless of whether we analyze Mr. Banister's claim under the *McDonnell Douglas* test or under the alternative methods of establishing a prima facie case (circumstantial, statistical, or direct evidence of discrimination), the claim fails. The case under the four-prong *McDonnell Douglas* test suffers from frailties similar to the race discrimination claim. Given the persistence

of his comments to Mr. Riley that were violative of the University's racial harassment policies, it is doubtful that Mr. Banister could meet the "qualified for the position" prong of the test. More importantly, Mr. Banister has not introduced any evidence indicating whether he has been replaced by a younger employee or not. Similarly, he has not introduced statistical or direct evidence that his termination was motivated by his age. As to circumstantial evidence, Mr. Banister points only to the fact that he received discipline more severe than younger employees. However, the inference suggested is undermined by (1) the fact that an employee older than Mr. Banister (June Johnson) received *less* severe discipline than did Mr. Banister; and (2) the prohibited conduct engaged in by the younger employees was more in the nature of isolated incidents than the persistent, sometimes threatening comments of Mr. Banister were. Therefore, Mr. Banister has failed to prove facts sufficient to defeat the motion for summary judgment on his age discrimination claim.

*First Amendment Right to Freedom of Speech*

In his complaint, Mr. Banister alleges that his termination was in violation of his right to freedom of speech. 28 U.S.C. §1983 provides a cause of action for termination in violation of a plaintiff's First Amendment rights where a plaintiff can demonstrate:

> (1) that she was engaged in a constitutionally protected activity; (2) that the defendants' adverse action caused her to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of her constitutional rights.

*Gragg v. Kentucky Cabinet for Workforce Development*, 289 F.3d 958, 965 (6th Cir. 2002) (quoting *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 715 (6th Cir. 2001)). In *Gragg*, the Sixth Circuit held that speech is protected by the First Amendment "when it addresses a matter of public concern, and the employee's interest in making such statements outweighs the

12

'interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.*, quoting *Bailey v. Floyd Country Bd. of Educ.*, 106 F.3d 135, 144 (6th Cir. 1997). The United States Supreme Court has held that an employee's speech addresses a matter of public concern when it is "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690 (1983). Further, the court in *Connick* held that

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel a decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147. Also, the *Connick* court held that the determination of whether an employee's speech addresses a matter of public concern is a question of law that "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48. There is simply no indication that any of Mr. Banister's speech at issue here could fairly be considered to address a matter of public concern.

*Equal Protection*

Similarly, any remedy for a violation of Mr. Banister's right to equal protection of the law would be found in 42 U.S.C. §1983. Although it is not clear from his filings, the court assumes that Mr. Banister is basing this claim on his race.[1] The elements of such a claim are the same as those discussed above for Mr. Banister's reverse race discrimination claim.

---

[1]Age is not a suspect classification for equal protection purposes. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 83, 120 S.Ct. 631, 645, 145 L.Ed.2d 522 (2000); *Gregory v. Ashcroft*, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); *Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).

*Wrongful Discharge*

Mr. Banister's complaint also alleges the tort of wrongful discharge, a state-law claim. Defendants argue that summary judgment is appropriate on any such claim because the University is protected from being sued by Kentucky's sovereign immunity. *Withers v. University of Kentucky* conclusively established that, under Kentucky law, the University is so entitled. 939 S.W.2d 340, 344 (Ky. 1997). That court also noted that "the immunity of the Commonwealth does not extend to its agents, servants and employees." *Id*. at 342, n.1, citing *Gould v. O'Bannon*, 770 S.W.2d 220 (Ky. 1989); *Happy v. Erwin*, 330 S.W.2d 412 (Ky, 1959). Therefore, as to the University of Kentucky and the Commonwealth, the wrongful discharge claim is barred by sovereign immunity. The other defendants (the University's Board of Trustees, Provost Neitzel and Dean Smith) are not so protected. Therefore, the court will analyze Mr. Banister's wrongful discharge claim for summary judgment purposes.

In Kentucky, the tort of wrongful discharge is limited in scope; one of the exceptions to the general rule of employment at-will occurs when the discharge was contrary to public policy. In order for a discharge to be wrongful because it is in violation of public policy:

> (1) [t]he discharge must be contrary to a fundamental and well-defined public policy as evidenced by existing law. (2) [t]hat policy must be evidenced by a constitutional or statutory provision. (3) [t]he decision of whether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact.

*Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985) (citing *Brockmeyer v. Dun & Bradstreet*, 113 Wis.2d 561, 335 N.W.2d 834 (Wis. 1983)). Mr. Banister does not state which public policy, if any, he believes his discharge to have violated. If, however, the claim is presumed to rest on similar facts to Mr. Banister's other claims in this case (reverse race discrimination and age discrimination), summary judgment is nevertheless appropriate. Those claims would rest upon

KRS 344.040, which provides that it is "unlawful practice for an employer ... to discharge any individual ...because of such individual's race, color, religion, national origin, sex, or age between forty (40) and seventy (70)."  That same statute provides the remedy, in the form of its grant of power to the Kentucky Commission on Human Rights to adjudicate claims under the statute, for any violations thereof.  The Kentucky Supreme Court held that "[w]here the statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute."  *Grzyb v. Evans*, 700 S.W.2d 401.  Therefore, summary judgment on Mr. Banister's wrongful discharge claim is appropriate.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is **GRANTED**.  An appropriate order shall issue.